Affirmed as Modified and Memorandum Opinion filed October 20, 2005









Affirmed
as Modified and Memorandum Opinion filed October 20, 2005.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00797-CV

____________

 

THE BANCSERVICES
GROUP, INC. AND GLENN C. AULT, JR., Appellants

 

V.

 

STRUNK &
ASSOCIATES, L.P., Appellee

 



 

On Appeal from the 333rd
District Court

Harris County, Texas

Trial Court Cause No. 00-35446

 



 

M E M O R A N D U M   O P I N I O N








Appellee Strunk & Associates, L.P.
sued appellants The Bancservices Group, Inc. and Glenn C. Ault, Jr. for
misappropriation of trade secrets, breach of contract, tortious interference,
and conspiracy alleging appellants copied and misappropriated Strunk=s trade secrets
related to its overdraft privilege program for banks.  The jury found Ault and Bancservices
misappropriated Strunk=s trade secrets, and Strunk was
awarded  $601,000 in damages.  The trial court also awarded Strunk attorney=s fees against
Ault.  Bancservices and Ault appeal from
the judgment awarding Strunk actual damages and attorney=s fees and argue
the following three issues on appeal: 
(1) there is no evidence Strunk possessed trade secrets as defined under
Texas law, and the evidence conclusively establishes the information could not
be a trade secret because the information was voluntarily disclosed by Strunk
and is commonly known; (2) there is no evidence Ault or Bancservices used
Strunk=s alleged trade
secrets in the conduct of their business; and (3) the trial court erred in
awarding attorney=s fees against Ault.  We modify the judgment to delete the award of
attorney=s fees and affirm
the judgment as modified.

I.  Background

In the early 1990's, Sam Davis joined
Strunk and Associates (AStrunk@), a bank
consulting firm, and began to research a bank overdraft program.  Davis and other consultants at Strunk spent
at least two years researching the best method for banks to address
checking account overdrafts.  Strunk
developed an overdraft privilege program it marketed to banks in which the
banks could increase their profit from overdraft fees while the customers could
avoid the embarrassment of a returned check. 
By 1996, Strunk had sold the program to at least six banks and its
business was growing.  Each bank agreed
to pay Strunk twenty percent of its profit from the program for the first two
years of the program. 

Davis testified that in the early days of
the program, some banks rejected Strunk=s proposal because
the banks thought they could implement the program on their own.  Later, most of those banks returned to Strunk
and were willing to pay for Strunk=s program.  Davis explained that while some of the components
of the overdraft privilege program are well known in the banking industry, the
compilation and application of those components is unique to the Strunk
program.  The program provides banks with
a competitive advantage and is not easy to compile from public sources without
obtaining information through improper means. 









In August, 1997, Sam Pierce came to work
for Strunk.  During his employment, the
confidential nature of the overdraft privilege program was explained to
Pierce.  Employees of Strunk were
required to sign a confidentiality agreement, but Pierce failed to do so.  While working for Strunk, Pierce downloaded
files concerning the overdraft privilege program from his computer at Strunk.  After leaving Strunk in January, 1998, Pierce
entered into an agreement with Bill Brady and Glenn Ault to modify the
materials he had taken from Strunk and use those materials plus the knowledge
he learned while working at Strunk to market a program in competition with
Strunk. Pierce, Brady, and Ault called their new company Impact Financial
Services (AImpact@).  

After Pierce left Strunk, one of Strunk=s bank customers
phoned to tell Strunk that Pierce presented a program to the bank very similar
to the overdraft privilege program presented by Strunk.  Based on that telephone call and other
information, Strunk initiated a lawsuit in federal court against Pierce.  In an agreement to settle the federal
lawsuit, Strunk granted a license to Impact for approximately $600,000.  In July, 1999, Pierce conveyed his interest
in Impact to Brady and Ault.  A dispute
arose between Brady and Ault over ownership of Impact, so in November, 1999,
Ault left Impact.  Ault and Pierce later
agreed to create a new company to market and implement the overdraft privilege
program.  The new company was called
Bancservices Group, Inc. (ABancservices@).  The training, concepts, and materials from
Bancservices were to be based on the Impact materials that Pierce admitted he
substantially derived from Strunk. 
Although Pierce attempted to obtain a license from Strunk, Pierce
defaulted on the payment of the license, so Strunk revoked the license.  

Strunk filed suit in state court for
misappropriation of trade secrets, breach of contract, tortious interference,
and conspiracy.  Pierce settled with
Strunk prior to trial.  The jury found Bancservices
and Ault misappropriated trade secrets and that $601,000 would fairly
compensate Strunk for any damage caused by that misappropriation. 

II.  Legal Sufficiency of the Evidence








In their first two issues, Bancservices
and Ault contend the evidence is legally insufficient to support the jury=s finding that the
overdraft privilege program was a trade secret and that Bancservices and Ault
misappropriated that secret.  The jury
found that Ault and Bancservices misappropriated Strunk and Associates= trade
secrets.  The jury found $25,000 in
damages for Ault=s misappropriation and $576,000 in damages
for Bancservices= misappropriation.  On appeal, appellants seek a reversal and
rendition in their favor based on the legal insufficiency of the evidence to
support the jury=s findings.

A. 
Standard of Review

An appellant attacking the legal
sufficiency of an adverse finding on an issue on which he did not have the
burden of proof must demonstrate on appeal there is no evidence to support the
adverse finding.  Formosa Plastics
Corp. USA v. Presidio Eng=rs &
Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998).  In reviewing a no evidence issue, we consider
only the evidence and inferences that tend to support the finding and disregard
all evidence and inferences to the contrary. 
See Lenz v. Lenz, 79 S.W.3d 10, 19 (Tex. 2002).  If more than a scintilla of evidence exists
to support the finding, the no evidence challenge fails.  Id.

B. 
Trade Secret  

The jury was instructed:

A Atrade secret@ means any process, compilation of
information, formula, pattern, or device that gives a business an opportunity
to obtain an advantage over competitors who do not know or use it.  In order to be a Atrade secret,@ there must be a substantial
element of, though not absolute, secrecy and a party must take reasonable
measures to protect the secrecy of its trade secrets.  Matters of public knowledge or of general
knowledge in an industry cannot be Atrade secrets.@  However, a Atrade secret@ need not be novel or unique and it
may consist of a combination of simple and otherwise known components.  The fact that a trade secret can be
discovered by experimentation and other lawful means does not deprive its owner
of protection from those acquiring it by unfair means.  The personal efficiency, inventiveness, skills
and experience that an employee develops through work belong to the employee,
not the former employer; however, trade secrets developed by the employee in
the course and scope of his employment, and trade secrets disclosed to the
employee by the employer, are the property of the employer, not the employee.

 

To determine whether a trade secret
exists, Texas courts apply a six-factor test:








(1) the extent to which the
information is known outside of his business; 

(2) the extent to which it is known
by employees and others involved in his business; 

(3) the extent of the measures
taken by him to guard the secrecy of the information; 

(4) the value of the information to
him and to his competitors; 

(5) the amount of effort or money
expended by him in developing the information; 

(6) the ease or difficulty with
which the information could be properly acquired or duplicated by others. 

 

In re Bass, 113 S.W.3d 735, 739 (Tex. 2003).  The party claiming a trade secret is not
required to satisfy all six factors Abecause trade
secrets do not fit neatly into each factor every time.@ Id. at
740.  The status of information claimed
as a trade secret must be determined through a comparative evaluation of all
the relevant factors, including the value, secrecy, and definiteness of the
information as well as the nature of the defendant=s misconduct. Id.
at 739. The party claiming trade secret status bears the burden of proof of
establishing that something is a trade secret. 
Stewart &  Stevenson
Serv. Inc. v. Serv-Tech, Inc., 879 S.W.2d 89, 99 (Tex. App.CHouston [14th
Dist.] 1994, writ denied).

Here, Sam Davis testified that while some
of the component parts of the overdraft privilege program were generally known
in the banking business, the compilation and implementation of those parts were
not generally known.  In fact, Davis
testified that some banks that had initially rejected Strunk because they
thought they could create the program on their own, returned to Strunk because
they were unable to re-create the program with their general knowledge.  All employees of Strunk were required to sign
a confidentiality agreement.  In
addition, the banks who purchased the program were required to sign a
confidentiality agreement.  The
information was valuable to Strunk and its competitors because it provided
banks with a competitive advantage. 
Davis testified that Strunk spent tens of thousands of hours developing,
testing, and implementing the program. 








Appellants contend the program was
generally known in the banking industry and nothing Bancservices was selling
was confidential or not generally known. 
The supreme court has held, however, that while a person or company may
gain possession of a competitor=s product, and
through inspection and analysis, create a duplicate, the mere fact that such
lawful acquisition is available does not mean he may, through a breach of
confidence, gain the information in usable form.  K & G Oil Tool & Serv. Co. v. G
& G Fishing Tool Serv., 158 Tex. 594, 503, 314 S.W.2d 782, 788
(1958).  The fact that a trade secret is
of such a nature that it can be discovered by experimentation or other fair and
lawful means does not deprive its owner of the right to protection from those
who would secure possession of it by unfair means.  Id. 
In other words, while Pierce or others could have engaged in the same
research done by Davis and Strunk and spent the time to develop the overdraft
privilege program, Pierce was not entitled to download Strunk=s information from
Strunk=s computer and use
that information to compete with Strunk.

We find more than a scintilla of evidence
to support the jury=s finding that the overdraft privilege
program was a trade secret.  Appellants= first issue is
overruled.

C. 
Usage of a Trade Secret

In their second issue, appellants contend
the evidence is legally insufficient to show they used the trade secret.   The elements of misappropriation of a trade
secret are:  (1) existence of a trade
secret;  (2) breach of a confidential relationship
or improper discovery of a trade secret; 
(3) use of the trade secret;  and
(4) damages.  Trilogy Software, Inc.
v. Callidus Software, Inc., 143 S.W.3d 452, 463 (Tex. App.CAustin 2004, pet.
denied).  Use of a trade secret means
commercial use, by which a person seeks to profit from the use of the
secret.  Atlantic Richfield Co. v.
Misty Prods., Inc., 820 S.W.2d 414, 421 (Tex. App.CHouston [14th
Dist.] 1991, writ denied).

With regard to use of a trade secret, the
jury was instructed:








A person Amisappropriates@ a trade secret if he discloses it
or uses it (a) in breach of a confidential relationship, or (b) after learning
the trade secret from a third person with notice of the facts that it was a
secret and that the third person=s disclosure of it was otherwise a breach of duty to the
other.  Misappropriation does not require
that he use it in exactly the form in which he received it; however, it must be
substantially derived therefrom.  He may
be liable even if he uses it with modifications or improvements upon it
effected by his own efforts.  Liability
is avoided when the contribution of the other=s secret is slight and the actor=s process can be said to have been
derived from other sources.

 

Appellants contend the evidence is legally
insufficient to show they misappropriated a trade secret because the
implementation program being used by Bancservices was developed by Ault,
Raymond Huston, and Marty Morris without the benefit of Pierce=s materials and
knowledge from Strunk.  The record
reflects, however, the implementation and training materials used by
Bancservices and the materials originally created by Strunk are similar beyond
coincidence.  Davis testified that the
Strunk program refers to a project plan, which is formatted as a
spreadsheet.  Bancservices uses the same
information, calls it a time schedule, and formats it as an outline.  Strunk created a series of collection letters
to be used by the banks in collecting the overdraft amounts.  Strunk uses six to eight letters and
recommends they be sent at specific intervals. 
Bancservices uses the same or similar letters with similar timetables.  Strunk spent several months determining how
many test accounts should be used by each bank before the bank initiated the
overdraft program.  Strunk, after much
research, learned that five test accounts was the optimal number for the
bank.  Bancservices also recommends five
test accounts.  Further, the questions
and answers to be used in training bank employees are virtually identical.








The record reflects that Bancservices
ultimately acquired the overdraft privilege program through Pierce=s breach of his
confidential relationship with Strunk. 
With regard to whether Bancservices used the trade secret to the
disadvantage of Strunk, there was evidence that Bancservices sold their program
to several banks in competition with Strunk. 
Reviewing the evidence in the light most favorable to the verdict, we
find legally sufficient evidence that appellants misappropriated Strunk=s trade
secret.  Appellants= second issue is
overruled.

III. 
Attorney=s Fees

In issue three, Ault argues the trial court abused its
discretion in awarding attorney=s fees to Strunk.  The
final judgment awards Strunk attorney=s fees in the amount of $250,000 for
trial of the case, $130,000 in attorney=s fees should Strunk prevail in the
court of appeals, and $70,000 in attorney=s fees for a successful appeal to the
Texas Supreme Court.  

A.  Standard of
Review

The allowance of attorney=s fees is within the discretion of
the trial court and will only be reversed for an abuse of discretion.  See Butler v. Arrow Mirror & Glass,
Inc., 51 S.W.3d 787, 796 (Tex. App.CHouston [1st Dist.] 2001, no
pet.).  Attorney=s fees are not recoverable in an
action in tort or a suit upon a contract unless provided for by statute or
contract between the parties.  Holland
v. Wal-Mart Stores, Inc., 1 S.W.3d 91, 95 (Tex. 1999).

B.  Strunk=s Pleadings

Ault first contends he is not responsible for attorney=s fees under the statute pleaded by
Strunk.  In its petition, Strunk
specifically seeks recovery of attorney=s fees against Sam Pierce, Ault=s co-defendant, and alleges Pierce is
liable for attorney=s fees under section 143.002 of the Texas Civil Practice and
Remedies Code for accessing computer information in a manner prohibited by
Chapter 33 of the Texas Penal Code.  The
only other reference in Strunk=s petition to attorney=s fees is Strunk=s general request for attorney=s fees in the prayer.  Strunk=s prayer, however, does not state a
specific basis for recovery of attorney=s fees, or name the party against
whom the fees are sought.  Strunk argued
for the first time, in post-trial briefing, that it was entitled to attorney=s fees against Ault under section
38.001(8) of the Texas Civil Practice and Remedies Code.  Pursuant to an agreement between the parties,
the issue of attorney=s fees was submitted to the trial court for consideration
after the conclusion of the jury trial.








Ault argues Strunk is limited by its petition to recovery of
only those attorney=s fees provided for by section 143.002 of the Texas Civil
Practice and Remedies Code, under the Harmful Access by Computer statute,
because Strunk may only recover attorney=s fees on the specific ground in its
petition.  To be entitled to a
discretionary award of attorney=s fees, a movant must file an affirmative pleading requesting
attorney=s fees, unless the issue is waived or
tried by consent.  In re Pecht,
874 S.W.2d 797, 803 (Tex. App.CTexarkana 1994, no writ). 
A petition is sufficient if it gives fair and adequate notice of the
facts upon which the pleader bases its claim. 
Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 896B97 (Tex. 2000).  A plaintiff need only plead facts which, if
true, entitle him to the relief sought.  Mitchell
v. LaFlamme, 60 S.W.3d 123, 130 (Tex. App.CHouston [14th Dist.] 2000, no pet.)
(petition authorized recovery of attorney=s fees even though party failed to
plead for attorney=s fees under the proper statute given petition included a
general prayer for attorney=s fees and a recitation of 
facts entitling him to the relief sought); see also Swate v. Medina
Cmty. Hosp., 966 S.W.2d 693, 701B02 (Tex. App.CSan Antonio 1998, pet. denied)
(upholding award of attorney=s fees based on party=s post-verdict, prejudgment motion
for attorney=s fees where party=s request was supported by competent
evidence, opposing party was given ample time to respond, and opposing party presented
no evidence of surprise or injury).  








In this case, although Strunk=s petition seeks attorney=s fees under section 143.002 of the
Texas Civil Practice and Remedies Code against Pierce, the pleading includes a
general prayer in which Strunk requests attorney=s fees.  Additionally, Strunk=s petition details Ault=s breach of certain provisions of the
1998 Impact settlement agreement, which would support a recovery of attorney=s fees under Chapter 38 of the Texas
Civil Practice and Remedies Code.  See
LaFlamme, 60 S.W.3d at 130.  In
post-trial briefing, Ault objected to Strunk=s inadequate pleading of attorney=s fees.  Strunk then responded by detailing its
entitlement to attorney=s fees against Ault under Chapter 38.  The trial court conducted hearings on the
issue of attorney=s fees, during which the parties introduced evidence and
argued the merits of Strunk=s claim for attorney=s fees.  Based on the foregoing, we conclude Strunk=s pleadings support a claim for
attorney=s fees under Chapter 38 against
Ault.  

Strunk contends for the first time on appeal that it had a
contractual right to attorney=s fees under section 6.2 of the Impact settlement agreement,
a provision permitting the recovery of attorney=s fees in the event of a breach of
the agreement.  By failing to present
this theory to the trial court, Strunk has waived error on appeal on this
issue.  Strunk did not specifically plead
this portion of the contract in its petition. 
As detailed above, Strunk only sought statutory recovery of attorney=s fees under Chapter 38.  Strunk waived a contractual basis for
recovery of attorney=s fees because this argument was not raised in the trial
court below and is raised for the first time on appeal.  See Tex.
R. App. P. 33.1(a); Swink v. Alesi, 999 S.W.2d 107, 110 (Tex.
App.CHouston [14th Dist.] 1999, no pet.).

We conclude Strunk=s pleadings are sufficient to support
a claim for attorney=s fees against Ault under Chapter 38.  Having so concluded, we must next address
whether the trial court abused its discretion in awarding Strunk attorney=s fees on this basis.

C.  Attorney=s Fees under Chapter 38

Strunk argues it can recover attorney=s fees under section 38.001(8) of the
Texas Civil Practice and Remedies Code, which permits the recovery of attorney=s fees for a breach of contract.  Strunk argues Ault breached the settlement
agreement when he misappropriated trade secrets.  Because the settlement agreement was a
contract between the parties, Strunk argues Ault is liable for attorney=s fees for the breach of that
contract.  The jury, however, found that
Ault committed the tort of misappropriation of trade secrets and awarded tort
damages, not breach of contract damages. 









The jury was instructed to consider the following elements of
damages: AThe net monetary benefits gained by
[Ault and BancServices Group, Inc.] from the misappropriation of Plaintiff=s trade secrets, less that portion of
the benefits solely attributable to modifications or improvements, if any, made
by the Defendants, not derived from the Plaintiff=s trade secrets.@ 
As the misappropriation claim was pleaded, tried, and submitted to the
jury, it was not solely dependent on contractual terms.  The damages question for Strunk=s misappropriation claim instructed
the jury on a disgorgement measure of damages, not breach of contract
damages.  Trade secret damages typically
embrace some form of royalty, see Taco Cabana Int=l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1128 (5th Cir.
1991), but damages based on the benefits received by the defendant have been
upheld.  American Precision Vibrator
Co. v. Nat=l Air Vibrator Co, 764 S.W.2d 274, 279 (Tex. App.CHouston [1st Dist.] 1989, no
writ).  For a breach of contract action,
the measure of damages is not the benefits received by the defendant, but the
loss or damage actually sustained by the plaintiff.  Walden v. Affiliated Computer Serv., Inc.,
97 S.W.3d 303, 328 (Tex. App.CHouston [14th Dist.] 2003, pet. denied).  The jury charge also included a request for
exemplary damages, which are not recoverable for breach of contract.  See Twin City Fire Ins., Co. v. Davis, 904
S.W.2d 663, 665 (Tex. 1995). 

Strunk argues a stipulation made by the parties at trial
allows it to recover attorney=s fees.  The parties
stipulated a finding of liability on the misappropriation of trade secrets
claim would be the equivalent of a finding of liability on the breach of
contract claim.  The parties did not
stipulate that a finding of damages on the misappropriation of trade secrets
claim would equate to a finding of damages on the breach of contract
claim.  The record reflects the parties
agreed to the following stipulation: 

THE COURT:  All
right.  Now, the evidence is closed, the
Motions for Directed Verdict have all been ruled upon.

 

STRUNK=S COUNSEL: 
Well, we have this issue about the contract and how we=re gonna handle that, the stipulation, the contract,
misappropriation, same deal, no, reason to submit the contract.

 

THE COURT:. . . . 
All right.  We are not submitting
a question to the jury as to Mr. Ault=s
alleged breach of contract in this matter. 
We have reached a stipulation of sorts regarding this, but I would like
to try to state as accurately as I can; but I invite [counsel for Ault] to
interrupt if I=m not stating it correctly because my goal here is to
make sure that it=s complete and not go any further 








than intended.  I believe we=ve all agreed that if in fact there
was a theft of trade secrets by Ault that that would constitute a breach of
contract under the contract claim against him and therefore for that reason
there is no need to submit a liability question on contract.  That, however, is the extent of the
stipulation made by the Defendants because it is their position that there are
no contract damages sufficient to support recovery on a contract claim.  

Strunk=s counsel sought a further stipulation that a finding of
misappropriation would support an injunction as a contractual remedy.  Appellants declined the stipulation and the
trial court agreed a stipulation was unnecessary because the remedy for breach
of contract would be specific performance through injunctive relief, not
monetary damages.  Although the parties
stipulated to a finding of liability on breach of contract, there was no
finding as to damages for any breach of contract.  To recover attorney=s fees for a breach of contract, the
plaintiff must recover damages under the breach of contract action.  See Green Int=l, Inc. v. Solis, 951 S.W.2d 384, 390 (Tex. 1997).

Strunk=s misappropriation of trade secrets claim is a tort, and
attorney=s fees are not recoverable in tort
actions.  See Metropolitan Life Ins.
Co. v. Haney, 987 S.W.2d 236, 243B44 (Tex. App.CHouston [14th Dist.] 1999, pet.
denied).  Strunk did not recover damages
on its breach of contract claim, and the trial court denied Strunk=s request for injunctive relief based
on its breach of contract claim.  Because
Strunk did not prevail on its breach of contract claim, it was not entitled to
attorney=s fees under section 38.001(8) of the
Civil Practice and Remedies Code.  The
trial court, therefore, abused its discretion in awarding attorney=s fees.  Ault=s third issue is sustained.

The judgment of the trial court is modified to delete the
award of attorney=s fees.  The remainder
of the judgment is affirmed as modified.

 

/s/      John S. Anderson

Justice

 

Judgment
rendered and Memorandum Opinion filed October 20, 2005.

Panel consists
of Justices Yates, Anderson, and Hudson.